Robert Mackey, Esq (SBN 125961)
**LAW OFFICES OF ROBERT MACKEY**
660 Baker Street
Suite-A201
Costa Mesa, CA 92626
Tel: (412) 370-9110
Email: bobmackeyesq@aol.com

Stanley D. Ference IV, Esq.*
**ROBERT PEIRCE & ASSOCIATES, P.C.**
437 Grant Street, Suite 1100
Pittsburgh, PA 15219
Tel. (412) 281-7229
Email: mference@peircelaw.com

*Pro hac vice application forthcoming.

*Counsel for Plaintiff and the Proposed Class*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **PRISCILLA TIBERIA,** *on behalf of herself and all others similarly situated,*<br><br>**Plaintiff,**<br><br>v.<br><br>**LEMME INC.,**<br><br>**Defendant.** | **Case No:**<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff, Priscilla Tiberia ("Plaintiff"), on behalf of herself and all putative members of the "Class" (defined below), by and through their undersigned counsel, brings claims against Lemme Inc.("Defendant"), as a class action for deceptive marketing practices. Plaintiff makes the following allegations pursuant to the investigation of her counsel and based upon information and

1

belief, except as to the allegations specifically pertaining to the Plaintiff, which are based on personal knowledge.

### NATURE OF THE ACTION

1.      On or about September 16, 2024, Defendant introduced, marketed, and sold its "Lemme GLP-1 Daily" capsules (hereinafter the "Product") to the general public exclusively through its website: lemmelive.com.[1]

2.      By falsely advertising that consumers purchasing the Product will see "un-hunger" and weight loss benefits from an alleged increase in GLP-1 levels, Defendant has violated California's False Advertising Law (Cal. Bus. & Prof. Code §§ 17500, *et seq*.), Unfair Competition Law (Cal. Bus. & Prof. Code §§ 17200-17210), and Consumer Legal Remedies Act (Cal. Civ. Code §§ 1750-1785).

3.      This action seeks restitution for Plaintiff and members of the proposed Class for purchasing Lemme GLP-1 Daily capsules from lemmelive.com as well as public injunctive relief to stop Defendant from fleecing Californians in the future.

### PARTIES

4.      Plaintiff Priscilla Tiberia is a resident of the State of California.

5.      Defendant Lemme Inc. is a Delaware corporation with its principal place of business in the State of New York.

### JURISDICTION AND VENUE

6.      This action is properly before this Court, and this Court has subject matter jurisdiction over this action under the Class Action Fairness Act. Specifically, at least one member of the proposed class is a citizen of a different state from Defendant, the number of proposed Class

---

[1] *Lemme Innovates with Natural GLP-1 Supplement, Launching on September 16th,* PR NEWSWIRE (Sept. 12, 2024, at 9:00 ET), https://www.prnewswire.com/news-releases/lemme-innovates-with-natural-glp-1-supplement-launching-on-september-16th-302244038.html (Lemme GLP-1 Daily will be available to purchase exclusively on lemmelive.com on September 16, 2024).

members exceeds 100, and the aggregate amount in controversy exceeds the sum or value of $5,000,000.00, exclusive of interests and costs. *See* 28 U.S.C. § 1332(d)(2)(A).

7.    This Court has general and specific jurisdiction over the Defendant because Defendant has sufficient minimum contacts within the state of California to establish Defendant's presence in the state of California, and certain material acts upon which this suit is based occurred within the state of California. Defendant Lemme does substantial business in the state of California and within this District and otherwise maintains requisite minimum contacts with the state of California. Specifically, Defendant Lemme distributed and sold the Product in the state of California.

8.    Venue is also proper in this District under 28 U.S.C. § 1391(b)(2) because Defendant is subject to personal jurisdiction within the state of California and a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this District, including that Plaintiff purchased and used the Product in the state of California and in this District. Additionally, Defendant Lemme distributed the Product in this District, received substantial compensation and profits from the sale and lease of Product in this District, and has and continues to conceal and make misrepresentations and material omissions in this District.

## FACTUAL BACKGROUND AND SUBSTANTIVE ALLEGATIONS

### A.  GLP-1

9.    Glucagon-like peptide-1 ("GLP-1") agonists are a class of medications designed to treat type-2 diabetes that have shown themselves to also be extremely effective in helping people lose weight. GLP-1 agonists like semaglutide (Ozempic, Wegovy, Rybelsus) and dual GLP-1/GIP (glucose-dependent insulinotropic polypeptide) agonists like tirzepatide (Mounjaro, Zepbound) have become hugely popular as a result of their effectiveness.

10.    GLP-1 is a hormone made in the small intestine and the nucleus of the solitary tract (a region of the brain) that triggers the release of insulin from the pancreas (lowering blood sugar), blocks the release of glucose into the bloodstream, slows stomach emptying, and increases feelings of satiety.

3

11. Yet, GLP-1 has a half-life of just one to two minutes, as it is quickly degraded by enzymes in the body. As a result, no clinical data supports the notion that simply boosting the amount of naturally occurring GLP-1 in the body has sustained weight loss effects.

12. What makes GLP-1 agonists so effective is that the amino acid sequence of GLP-1 has been modified to make the agonists resistant to being broken down by the enzymes that break down GLP-1. Semaglutide, for example, has a half-life of about seven days when administered by injection—which is why people who take Ozempic or Wegovy take weekly injections—as opposed to one to two minutes.

13. Prescription GLP-1 agonist medications are widely understood by consumers to be pharmaceutical products designed to produce clinically meaningful appetite suppression and weight loss through sustained activation of GLP-1 pathways.

14. Given their effectiveness, the market for GLP-1 agonists has skyrocketed in recent years. The worldwide market in 2024 is estimated to have been more than $25 billion and the market is estimated to rise to between $50 billion and $133 billion worldwide by 2030.

15. Yet GLP-1 agonists are very expensive, and for those whose insurance will not cover the drugs, they are often cost-prohibitive.

16. Enter Lemme, a supplement brand founded by Simon Huck and Kourtney Kardashian Barker, hoping to cash in on the GLP-1 agonist craze and swindle Americans into buying their supplements instead.

**B. Defendant's Uniform Marketing Campaign**

17. Defendant marketed and sold "Lemme GLP-1 Daily" capsules to Californians beginning on or about September 16, 2024.

18. A one-month supply of the Product costs $90, and if consumers subscribe, a six-month supply costs $378. Defendants tell consumers to take "[t]wo capsules a day, taken with

4

food, to support your weight management goals," and—of course—the "best results" do not come without "consistent, daily use for at least 3-6 months."[2]

19. Defendant marketed the Product through a comprehensive and uniform advertising strategy across standardized channels, including online product pages, social media, and other promotional materials, using substantially similar messaging directed to consumers nationwide. In these advertisements, Defendant makes unsubstantiated, false, and/or misleading claims regarding the Product.

20. Defendant's marketing emphasizes that the Product could "boost" or "support" GLP-1 in a manner that would translate to appetite control and weight-loss outcomes associated in the public mind with prescription GLP-1 agonist medications.

21. Defendant's advertising further conveys that the Product's claimed benefits are supported by reliable scientific research, thereby communicating to consumers that Defendant possesses competent substantiation for the specific weight-loss and appetite-control claims being made.

22. Defendant claimed that clinical studies showed that the lemon extract (trademarked "Eriomin") increases the amount of naturally occurring GLP-1 in the body by 17 percent.

23. Defendant marketed the Product as a "Groundbreaking natural GLP-1 solution with no known side effects" for the sole purpose of "safely increas[ing] your GLP-1 Levels":

---

[2] *Lemme Reset*, LEMME, https://lemmelive.com/products/lemme-glp-1 (last visited June 17, 2026).



24.      Marketing that positions a dietary supplement as a "natural solution" or equivalent to a prescription GLP-1 agonist conveys to reasonable consumers that the supplement can deliver meaningful effects on appetite and weight loss.

25.      For example, Defendant's television advertising depicts such meaningful effects on appetite and weight loss that the Product claims to have.

26.      Defendant called GLP-1 the "un-hunger" hormone and touted the "power of GLP-1" in slowing digestion and managing hunger and claim that their supplement "promote[s] your body's GLP-1 production." "[F]actors like age, lifestyle, and diet can affect your body's ability to produce GLP-1. That's where we come in":

6



27.    In addition to calling GLP-1 the "un-hunger" hormone, Defendant called GLP-1 the "hormone responsible for appetite suppression, insulin release and blood glucose levels":

28.    Moreover, and upon information and belief, Defendant claimed that "[b]oosting GLP-1 levels in the body" using Lemme GLP-1 Daily "comes with a range of health benefits" including "healthy weight loss":

7



### C. Why the Challenged Claims are Misleading

29.     Defendant leverages consumer anxiety by highlighting the potential effects associated with synthetic GLP-1 agonist medications, like Ozempic, to position its Product as a safer, natural, more sustainable alternative. As seen here:





8

30.     This comprehensive advertising strategy is designed to influence consumers by shifting focus from efficacy to perceived harm, thereby creating a narrative that Defendant's Product does not have the side effects attributed to synthetic GLP-1 agonist medicines.

31.     By selectively emphasizing these risks—often without equivalent context regarding clinical benefits or prevalence—Defendant frames synthetic GLP-1 agonist medication therapies as problematic while implicitly elevating its Product as a more balanced solution that has the same results as a synthetic GLP-1 agonist medication.

32.     These statements misleadingly claim that supplementing naturally occurring GLP-1 will reduce hunger. Even if the studies upon which Defendant relies were not flawed (among other reasons, they rely on sample sizes that are far too small to derive valid statistical conclusions), Defendant provides no clinical evidence that increasing the amount of GLP-1 in the body by 17 percent has any impact on "un-hunger." "If it were that simple, the pharmaceutical industry wouldn't have spent decades developing stable GLP-1 analogs as the natural form breaks down too fast in the body to be effective."[3]

33.     To the contrary, the studies show that after taking Eriomin for four months, participants failed to show any decrease in body weight, body-mass index (BMI), or waist/hip ratio. The authors of the 2019 study upon which Defendant relied made this clear in their analyses, reporting that "[s]upplementation with Eriomin (200, 400, and 800 mg/day) and placebo had no effect on body weight, BMI, lean mass, fat mass, fat percentage, and hip waist ratio."[4] The 2022 study similarly reported that "[s]upplementation with Eriomin had no effect on blood pressure (systolic and diastolic), body weight, BMI, lean mass, fat mass, and ratio hip/waist."[5]

---

[3] Nini Munoz and Edward Nirenberg, *ABCDEFG . . . LEMME Unravel Kourtney Kardashian's Latest Supplement Fad*, TECHING IT APART (Sept. 20, 2024), https://techingitapart.substack.com/p/abcdefg-lemme-unravel-kourtney-kardashians?utm_source=profile&utm_medium=reader2.

[4] Ribeiro C.B., Ramos F.M., Manthey J.A., Cesar T.B., "Effectiveness of Eriomin in managing hyperglycemia and reversal of prediabetes condition: A double-blind, randomized, controlled study," 7 PHYTOTHERAPY RES. 11 (June 11, 2019), 1921–1933.

[5] Cesar T.B., Ramos F.M., & Ribeiro C.B., "Nutraceutical Eriocitrin (Eriomin) Reduces Hyperglycemia by Increasing Glucagon-Like Peptide 1 and Downregulates Systemic

9

34.    Crucially, the studies upon which Defendant relies demonstrate that the calories consumed by participants taking Eriomin (200, 400, and 800 mg/day) ***did not change*** throughout the study..[6]

35.    These results are hardly surprising. The primary mechanism by which GLP-1 levels rise in the body is eating—the release of GLP-1 while eating helps regulate satiety and slows gastric emptying. The resting concentration of active GLP-1 in the blood is between 5-10 pmol/L (picomoles per liter), which increases to approximately 50 pmol/L after eating, before breaking down.[7]

36.    As such, GLP-1 concentration in the blood increases by approximately 400 to 900 percent after eating. It is unsurprising, therefore, that a mere 17 percent increase in GLP-1, as advertised by Defendant's Product, would have no discernable effect on caloric consumption, BMI, or weight loss.

37.    Comparing Defendant's claims with GLP-1 agonists that actually *do* have an effect on caloric consumption, satiety, and weight loss shows even more starkly the misleading nature of Defendant's claims. A 1 mg weekly dose of Ozempic or Wegovy results in a concentration of synthetic GLP-1 (semaglutide) in the blood of approximately 30,000 pmol/L.[8] As the resting concentration of GLP-1 in the blood is 5 to 10 pmol/L, the resting concentration of GLP-1 agonists in the blood is *300,000 to 600,000 percent greater*—and with a half-life of seven days instead of two minutes, lasts more than 5,000 times longer in the body.

38.    Another reason that Defendant's advertisements are misleading is that, while they claim to have clinical support for the components of the Product, Defendant did not study the

Inflammation: A Crossover-Randomized Clinical Trial," 25 J. MED. FOOD 11 (Nov. 9, 2022), 1050–1058.

[6] *Id.*

[7] Padidela, Patterson M., Sharief N., Ghatei M., Hussain K., "Elevated basal and post-feed glucagon-like peptide 1 (GLP-1) concentrations in the neonatal period," EUROPEAN J. ENDOCRINOLOGY 2009 Jan 160:1: 53–58.

[8] Petri, K.C., Ingwersen, S.H., Flint, A., Zacho, J., Overgaard, R.V., "Semaglutide s.c. Once-Weekly in Type 2 Diabetes: A Population Pharmacokinetic Analysis," DIABETES THER. 2018 Jun 15:9(4):1533–1547.

combination of those extracts in a single supplement—meaning that the supplement has not been clinically tested. "[W]hile one could argue that research has occurred on these 3 active ingredients individually (ignoring the glaring problems with the quality of that work), no data has been made available regarding the combination of these agents in a single product."[9]

39. This is critical, because compounds may have an effect on other compounds when taken in combination, which is why over-the-counter medicines with multiple active ingredients are not considered to be safe and effective unless "combining of the active ingredients does not decrease the safety or effectiveness of any of the individual active ingredients[.]" 21 C.F.R. § 330.10 (a)(4)(iv).

### D. Plaintiff's Purchase, Reliance, and Injury

40. Beginning in or around October 2024, Plaintiff purchased Defendant's product while in the State of California after noticing an advertisement on Instagram.

41. Based on Defendant's advertisements on Instagram representing that the Product would help lose weight and suppress hunger, Plaintiff was redirected to Defendant's website.

42. Defendant's website advertisements represented that the Product was a safer, natural equivalent alternative to weight-loss medications and injections and would help lose weight and suppress hunger.

43. Plaintiff purchased the Product in reliance on Defendant's uniform marketing and the central message that the Product would provide GLP-1-related appetite and weight-loss benefits comparable to those associated with prescription GLP-1 agonist medications. Based on Defendant's uniform marketing, Plaintiff believed that purchasing and using the Product would provide her with a real and meaningful boost in Plaintiff's natural GLP-1 production, resulting in appetite control and healthy weight loss, provide similar results as if Plaintiff was on a synthetic GLP-1 agonist medication, such as Ozempic or Wegovy, and provide nutrition that would improve

---

[9] Nini Munoz and Edward Nirenberg, *ABCDEFG . . . LEMME Unravel Kourtney Kardashian's Latest Supplement Fad*, TECHING IT APART (Sept. 20, 2024), https://techingitapart.substack.com/p/abcdefg-lemme-unravel-kourtney-kardashians.

her hunger, health, and well-being. Plaintiff relied upon the claims made by Defendant that its advertisements were backed up with reliable and valid scientific research.

44.    The GLP-1 positioning and the comparison to prescription GLP-1 agonists were material to Plaintiff's purchasing decision and would be material to reasonable consumers seeking appetite control and weight loss.

45.    At no point, either during Plaintiff's research on the Product or at the point of sale, did Defendant disclose that the Product did not have the health benefits equivalent to a synthetic GLP-1 agonist medication that it advertised.

46.    Plaintiff took the Product twice daily, as instructed, for more than three months. Had she known that Defendant had no clinical basis to claim any hunger or weight loss benefits from the supplement's claimed increase in naturally occurring GLP-1 levels, she would not have purchased the Product or would have only been willing to purchase the supplement at a lower price.

47.    Plaintiff and Class members suffered economic injury, including paying a price premium attributable to the challenged GLP-1 and weight-loss representations and receiving a product worth less than represented.

## CLASS ALLEGATIONS

48.    Under Fed. R. Civ. P. 23(b)(2), (b)(3) and/or (c)(4), Plaintiff intends to seek certification of a Nationwide Class consisting of:

> **All individuals in the United States who purchased the Product within the relevant limitations period, and/or such subclasses as the Court may deem appropriate**.

49.    Plaintiff also intends to seek certification of a California Subclass, consisting of:

> **All persons residing in the State of California who purchased the Product within the statute of limitations.**

12

50.    Plaintiff reserves the right to re-define the Nationwide Class and California Subclass if further information and discovery indicate that the definitions of the Class and Subclass should be narrowed, expanded, or otherwise modified.

51.    Excluded from the Class is Defendant; any affiliate, parent, or subsidiary of Defendant; any entity in which Defendant has a controlling interest; any officer, director, or employee of Defendant; any successor or assign of Defendant; anyone employed by counsel for Plaintiff in this action; any judge to whom this case is assigned, his or her spouse, and all persons within the third degree of relationship to either of them and the spouses of such persons.

52.    **NUMEROSITY**: The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown and such information is in the exclusive control of Defendant, Plaintiff believes that the Class encompasses thousands of individuals who are geographically dispersed throughout the nation; therefore, the number of persons who are members of the Class are so numerous that joinder of all members in one action is impracticable.

53.    **COMMONALITY AND PREDOMINANCE**: There is a well-defined community of interest in the questions of law and fact affecting the Class members.

54.    There are questions of law and fact common to all members of the Class: specifically, Plaintiff's claims arise from the same event or practice or course of conduct by the Defendant giving rise to those claims of the putative Class, and Plaintiff's claims are based upon the same legal theories as those of the putative Class. The Defendant has engaged in a pattern and practice, in violation of the law, of misrepresenting the efficacy and health benefits of the Product. The resolution of this issue—to wit, whether Defendant knowingly sold the Products with misleading information and did not inform Plaintiff and Class members—is a common question of fact and law that will affect all members of the Class in the same manner.

55.    Other questions of law and fact common to the Class that predominate over questions that may affect individual members include:

13

a. Whether Defendant's marketing, advertising, packaging, labeling, and other promotional materials for Product are deceptive and misleading;

b. The nature, scope, and operation of Defendant's wrongful practices;

c. The uniformity of the advertisements created through Defendant's marketing materials;

d. Whether Defendant misrepresented the efficacy and health benefits of the Product;

e. Whether Defendant engaged in fraudulent and/or deceptive practices as to the Class members;

f. Whether Defendant violated state consumer protection laws by misrepresenting the efficacy and health benefits of the Product;

g. Whether, during the Class Period, Defendant engaged in unfair, fraudulent, and unlawful business practices under California's Unfair Competition Law ("UCL");

h. Whether, during the Class Period, Defendant engaged in false advertising under California's False Advertising Law ("FAL");

i. Whether Class members are entitled to restitution as a result of Defendant's conduct;

j. Whether Class members are entitled to recover attorney's fees; and

k. Whether Plaintiff and the Class suffered damages because of Defendant's misconduct and if so, the proper measure of damages.

56.     **TYPICALITY**: The claims and defenses of Plaintiff are representative of the Class members they seek to represent and typical of the claims of the Class because they arise from the same course of conduct and are based on the same legal theories as the claims of other Class members. Plaintiff, like all Class members, purchased the Product when they were presented by Defendant, through its representations on the Product's label and through Defendant's marketing and advertising of the Product, and were deceived, or were likely to be deceived, by Defendant's false advertising.

14

57. **ADEQUACY OF REPRESENTATION**: Plaintiff will fairly and adequately assert and protect the interests of the proposed Class because:

    a. Plaintiff has hired attorneys who are experienced in prosecuting class action claims and will adequately represent the interests of the Class;

    b. Plaintiff has no conflict of interest that will interfere with the maintenance of this class action; and

    c. Plaintiff has suffered consumer-related injuries and damages.

58. **SUPERIORITY**: class action provides a fair and efficient method for the adjudication of the instant controversy for the following reasons:

    a. The common questions of law and fact set forth above predominate over questions affecting only individual Class members;

    b. The proposed class is so numerous that joinder would prove impracticable. The proposed Class, however, is not so numerous as to create manageability problems; moreover, no unusual legal or factual issues render the Class unmanageable;

    c. Prosecution of separate actions by individual members of the Class would risk inconsistent and varying adjudications against Defendant;

    d. The claims of the individual Class members are small in relation to the expenses of litigation, making a class action the only procedure in which Class members can, as a practical matter, recover for the damages done to them by Defendant; and

    e. A class action would be superior to, and more efficient than, adjudicating thousands of individual lawsuits.

## CAUSES OF ACTION

### COUNT I
**Breach of California's False Advertising Law ("FAL")**
**Cal. Bus. & Prof. Code §§ 17500, et seq.**
**(On behalf of the Nationwide Class or, alternatively, on behalf of the California Subclass)**

59. Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

60. Plaintiff brings this claim on behalf of herself and on behalf of the Class.

15

61.     Defendant's false, misleading, and deceptive advertising and marketing practices to increase its profits, was intended to induce reliance, and Plaintiff and those similarly situated relied to their detriment on Defendant's false, misleading, and deceptive advertising and marketing practices. Had Plaintiff and those similarly situated been adequately informed and not intentionally deceived by Defendant through Defendant's false representations and omissions, they would have acted differently by, without limitation, refraining from purchasing the Product or paying less for it.

62.     Defendant made and disseminated advertising statements and omissions in connection with the sale of the Product that were likely to deceive reasonable consumers acting reasonably under the circumstances. .

63.     The challenged advertising conveyed that the Product would provide meaningful GLP-1-related appetite suppression and weight-loss benefits comparable to those associated with prescription GLP-1 agonist medications, and that such claims were supported by reliable scientific research.

64.     These representations were false or misleading because the Product could not deliver the advertised GLP-1 agonist-like outcomes as represented and/or Defendant lacked competent and reliable substantiation for the specific claims being made at the time of dissemination.

65.     The misrepresentations and omissions were material and were a substantial factor in Plaintiff's and Class members' decisions to purchase the Product.

66.     Defendant engaged in these false, misleading, and deceptive advertising and marketing practices to increase its profits. Accordingly, Defendant has engaged in false advertising, as defined and prohibited by §§ 17500, *et seq*., of the California Business and Professions Code.

67.     The aforementioned practices also constitute unlawful competition and provide an unlawful advantage over Defendant's competitors, as well as injury to the general public.

68.     As a direct and proximate result of such actions, Plaintiff and the other members of the Class have suffered injury in fact, and have lost money as a result of such false, deceptive, and misleading advertising in an amount which will be proven at trial, but which is in excess of the jurisdictional minimum of this Court. In particular, Plaintiff and those similarly situated paid a premium for the Product, i.e., the difference between the price they paid for the Product and the price they would have paid but for Defendant's misrepresentations and omissions.

69.     Plaintiff seeks, on behalf of herself and those similarly situated, restitution of the difference between what Defendant acquired from Plaintiff, the general public, and/or the Class, and what would have been acquired in absence of the false, misleading, and deceptive advertising and marketing practices complained of herein, which amount will be proven at trial, plus interest thereon.

70.     Plaintiff seeks, on behalf of herself and those similarly situated, a declaration that the aforementioned practices constitute false, misleading, and deceptive advertising.

**COUNT II**
**Breach of California's Consumer Legal Remedies Act ("CLRA")**
**Cal. Civ. Code §§ 1750-1785**
**(On behalf of the California Subclass)**

71.     Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

72.     Plaintiff brings this claim on behalf of herself and on behalf of the Class.

73.     Defendant is a "person" within the meaning of Cal. Civ. Code § 1761(c).

74.     Plaintiff and the members of the Class are "consumers" as defined by Cal. Civ. Code § 1761(d).

75.     The Product is a "good" as defined under Cal. Civ. Code § 1761(a).

76.     The CLRA proscribes "unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer." Cal. Civ. Code § 1770(a).

77.    Defendant engaged in unfair and/or deceptive acts in violation of the CLRA principally because it intentionally or negligently concealed and suppressed material facts by representing that the Product was a safer, natural equivalent alternative to weight-loss medications and injections, such as Ozempic; that the Product would safely and effectively provide Plaintiff with the same benefits of a synthetic GLP-1 agonist medication; and that the Product would improve overall hunger, health, and well-being.

78.    Defendant accomplished this by explicitly representing that the Product was a natural equivalent alternative to synthetic GLP-1 agonist medications and by failing to disclose and/or concealing that the Product did not contain a synthetic GLP-1 agonist in other marketing and Product labeling. Defendant's conduct violated the CLRA, including but not limited to, the following provisions:

    a.    Defendant represented and continues to represent that the Product has characteristics, uses, or benefits that it does not have, in violation of § 1770(a)(5);

    b.    Defendant represented and continues to represent that the Product is of a particular standard, quality, or grade when, in fact, it is not, in violation of § 1770(a)(7);

    c.    Defendant advertised and continues to advertise its Product with the intent not to sell them as advertised, in violation of § 1770(a)(9); and

    d.    Defendant represented and continues to represent that its Product has been supplied in accordance with a previous representation when it has not, in violation of § 1770(a)(16).

79.    Defendant's conduct was unfair because it exploited consumer demand for GLP-1 agonist-like weight-loss results while shifting consumer focus to perceived safety narratives and away from whether the Product could actually deliver the promised efficacy.

80.    Defendant's unfair and/or deceptive acts or practices repeatedly occurred in its trade or business and were capable of deceiving a substantial portion of the purchasing public.

18

81. Defendant knew, should have known, or was reckless in not knowing that the Product was not a natural equivalent alternative to a synthetic GLP-1 agonist medications that Defendant claimed it was and, therefore, that the Product is not suitable for its intended use.

82. Defendant was under a duty to Plaintiff and the Class to disclose that the Product was not a natural equivalent alternative to synthetic GLP-1 agonist medications because:

a. The facts that Defendant misrepresented to, and concealed from, Plaintiff and the Class are material because a reasonable consumer would have considered (and in fact did consider) them to be important in deciding whether to purchase the Product or pay a lesser price for it; and

b. The lack of GLP-1 agonist content of the Product poses a serious fitness consideration for consumers and affects the central utility of the Product for its intended use in weight loss.

83. In failing to disclose that the Product was not a natural equivalent alternative to a synthetic GLP-1 agonist medication, Defendant knowingly and intentionally concealed material facts in violation of its duty to disclose.

84. Plaintiff and the Class members have suffered injury in fact and actual damages resulting from Defendant's material misrepresentations and omissions, including purchasing a Product they otherwise would not have purchased, paying more for the Product than they otherwise would have paid, and being left with a Product of diminished value and utility because it is not an natural equivalent alternative to a synthetic GLP-1 agonist medication.

85. As a direct and proximate result of Defendant's unfair and deceptive conduct, therefore, Plaintiff and the Class members have been harmed and seek declaratory and injunctive relief, to be further determined at trial.

86. Pursuant to Cal. Civ. Code § 1780(a) and (e), Plaintiff and the Class further seek an order awarding (a) actual damages resulting from the purchase of the Product sold throughout the Class Period to all Class Members; (b) punitive damages; (c) restitution; and (d) attorneys' fees and costs.

87.     Plaintiff provided statutory notice to Defendant of her claims pursuant to Cal. Civ. Code § 1782, which Defendant received on April 6, 2026.

### COUNT III
### Breach of the California's Unfair Competition Law ("UCL")
### Cal. Bus. & Prof. Code §§ 1720-17210
### (On behalf of the California Subclass)

88.     Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

89.     Plaintiff brings this claim on behalf of herself and on behalf of the California Subclass.

90.     The UCL proscribes acts of unfair competition, including "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200.

**Unfair Business Practices**

91.     A business act or practice is unfair under the UCL if it offends an established public policy or is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers, and unfairness is determined by weighing the reasons, justifications, and motives of the practice against the gravity of the harm to the alleged victims.

92.     Defendant's conduct, including, but not limited to, its false advertising scheme, is unfair because it violated California's public policy, including that which is legislatively declared in the CLRA, requiring a manufacturer to ensure that goods it places on the market are of a particular standard, quality, or grade. Defendant has failed to do this by placing the Product on the market even though it is not a natural equivalent alternative to synthetic GLP-1 agonist medication despite the Product being advertised as one.

93.     Defendant acted in an immoral, unethical, oppressive, and unscrupulous manner in at least the following respects:

    a.  Selling Plaintiff and the Class a Product that is not a natural equivalent alternative to a synthetic GLP-1 agonist medication despite it being claimed as one;

20

    b.   Failing to disclose that the Product is not a natural equivalent alternative to a synthetic GLP-1 agonist medication, despite the opportunity to do so in numerous locations that people in the market for such products would be likely to encounter;

    c.   Failing to exercise adequate quality control and due diligence over the Product before placing it on the market; and

    d.   Failing to acknowledge the scope and severity of the misrepresentation of the Product not being a natural equivalent alternative to a synthetic GLP-1 agonist medication, which poses serious concerns for consumers in the market for products conducive weight loss.

94.    The harm to Plaintiff and Class members outweighs any rationale for Defendant's practices. There were alternative means of furthering Defendant's legitimate business interests other than deceiving their customers.

**Fraudulent Business Practices**

95.    Defendant's conduct is fraudulent in violation of the UCL.

96.    Defendant's false advertising scheme alleged herein constitutes a fraudulent business practice because Defendant made representations about the Product that were false and misleading.

97.    Specifically, Defendant's fraudulent acts include knowingly and intentionally concealing from Plaintiff and the Class that the Product was not a natural equivalent alternative to a synthetic GLP-1 agonist medication and falsely marketing and misrepresenting the Product as being one when the Protect did not contain a synthetic GLP-1 agonist.

98.    Defendant's statements are likely to deceive, and did deceive, Plaintiff and Class members.

99.    Defendant's misrepresentations and omissions alleged herein caused Plaintiff and the Class to purchase the Product, or pay more than they would have.

100.    Accordingly, Plaintiff and the Class have suffered injuries in fact, including loss of money used to purchase the Product, as a result of Defendant's unlawful, unfair, and fraudulent acts. Absent these acts, Plaintiff and the Class would not have purchased the Product at all, or at least not at the prices they paid.

101.    Plaintiff and the Class seek appropriate relief under the UCL, including such orders as may be necessary to: (a) enjoin Defendant from continuing its unlawful, unfair, and fraudulent acts or practices and (b) restore Plaintiff and the Class any money Defendant acquired by its unfair competition, including restitution. Plaintiff also seeks reasonable attorneys' fees and expenses under applicable law.

**Unlawful Business Practices**

102.    A business practice is unlawful under the UCL if it violates any other law or regulation.

103.    Defendant engaged in unlawful business practices by violating California's False Advertising Law.

104.    Defendant further engaged in unlawful business practices by violating the Consumer Legal Remedies Act, by falsely representing that its supplement has characteristics and benefits that it does not have, is fit for its intended use, and is of a particular standard, quality, or grade.

105.    Defendant's unlawful, unfair, and fraudulent business practices have unjustly enriched Defendants at the expense of Plaintiff and Class members.

<u>**PRAYER FOR RELIEF**</u>

**WHEREFORE**, Plaintiff prays for judgment as follows:

    a.  For an order certifying the proposed Class and appointing Plaintiff and Plaintiff's counsel to represent the Class;

    b.  For an order awarding Plaintiff and Class members actual, statutory, punitive, and/or any other form of damages provided by and pursuant to the statutes cited above;

    c.  For an order awarding Plaintiff and Class members restitution, disgorgement and/or other equitable relief provided by and pursuant to the statutes cited above or as the Court deems proper;

    d.  For an order awarding Plaintiff and Class members pre-judgment and post-judgment interest;

e.  For an order awarding Plaintiff and Class members reasonable attorney fees and costs of suit, including expert witness fees; and

f.  For an order awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff, individually and on behalf of the members of the Class, hereby respectfully demand trial by jury of all issues triable by right.

DATED: July 13, 2026                          Respectfully Submitted,

*/s/ Robert Mackey*
Robert Mackey, Esq. (SBN 125961)
**LAW OFFICES OF ROBERT MACKEY**
660 Baker Street
Suite-A201
Costa Mesa, CA 92626
Tel. (412) 370-9110
bobmackeyesq@aol.com

Stanley D. Ference IV, Esq.*
**ROBERT PEIRCE & ASSOCIATES, P.C.**
437 Grant Street, Suite 1100
Pittsburgh, PA 15219
Tel. (412) 281-7229
mference@peircelaw.com

*Pro hac vice application forthcoming.

*Attorneys for Plaintiff and Putative Class*

23